Our second case today is number 2017-30, Joseph v. Target Stores. For the benefit of the students, this is commonly referred to, I think, as a slip and fall case in the Target Store. And with that, the lawyer for Ms. Joseph is Mr. Kevin Leach, and he gets to speak first. Good to have you here, Mr. Leach. Thank you so much, Judge King. Good morning. May it please the Court, my name is Kevin Leach, for the record. I represent the appellant, Mrs. Joseph, in this matter. We're going to go from the heady area of international law, by the sounds of it, to slip and fall cases today. Very important, very important area of the law, and I'll get into that in just a second. Your Honors, this is a slip and fall case, and we're asking for reversal of the district court's order granting summary judgment to Target, because there are issues of fact that remain for trial in this matter. The appellant, Mrs. Joseph, slipped in a clear puddle of water in the back of the Target Store after heavy rain fell in the early morning hours of May 21, 2016. The rain stopped at about 7 a.m., and Mrs. Joseph slipped at 1.20 p.m. She was working as a product demonstrator, not as a Target employee. The store had a six-year history of roof leaking after heavy rains, and it was so common that the employees were told to be on the lookout for puddles at team meetings after heavy rains, but Target never gave any training on safety measures, warnings to customers. Counsel, on that, just to address that point, I mean, the record, I saw that in the briefs, but it looked to me like your claim before the district court in the summary judgment briefings, you didn't advance your negligent not-in-a-premises liability claim, but in a claim because you're not responding to a history of leaks. That's a fair statement, Judge, although the complaint does state that there was a failure to operate the store. I think the complaint would have covered that claim, but you didn't advance it, and I'm not criticizing you before the district court, so to now use that as a basis for there being a genuine issue of material facts seems to put us in a difficult spot. We really don't do that. I understand your questioning there, Judge. I think I would use it probably more for the fact that this has a factual record of why employees should be on notice, why they should be vigilant to inspect for puddles on the water after heavy rain, so we don't have to advance the case for negligent operation for recurrent danger, but we should not lose track of the fact that this is a… That's a different, but to be fair, that's a different theory of negligence. Negligence of premises liability, as I understand, advanced before the district court was a classic premises liability claim. You have to show constructive notice, which means you have to show something was noticeable and had been there for a sufficient period of time. I think we can narrow the issues to what you want, Judge. I appreciate that. It's not what I want. It's what you argued below. I don't care. Then I will accept it, and I will move on, but I think it's fair, and I will move on to the other issues. In this case, Target does… It claims it does not know what caused the puddle to form inside the store, and the puddle that Mrs. Joseph slipped on was formed by drips of rainwater from the ceiling. There was no sudden gush of water that caused this puddle. There's no evidence of that, despite the defendant's argument that it could have been that. There's no evidence. By 1.20 p.m., Your Honors… There's no evidence one way or the other? Yes, Your Honor. The accident report indicates that the puddle was formed by drips from the ceiling, and it was caused by rain after the storm. It rained all night, didn't it? Say again? It rained all night? It did rain all night, Judge. Several hours, right? Yes, but there's a meteorologist report in the record, so it does say… You're talking about the incident report? No, the meteorologist expert report is in the record. And the incident report also. The target's own incident report. Correct. They said the floor was wet from a ceiling leak, from water from excessive rain. That would be consistent with the meteorologist report. That was the day of the fall. Absolutely, Judge. Very good. So, by 1.20 p.m.… What's the evidence as to when it began? The meteorologist report, which is an expert report in evidence, before the court, indicates it was the early morning hours as I sit here. I was going to ask a bad question. Not when the rain began, but when the water came from the roof into the floor. What's the evidence in the record as to when that first started? We don't have evidence, Judge, as to when it first started hitting the floor. And it's a good question because now you're into the issue of was there constructive notice if you don't know when it hit the floor and where you're going to go with that. So, in this particular case, we actually have five areas that we can cover. Actually, I'm going to trim it down to four areas on that issue or consistent with that issue. But let's just go to the first one because I think it's important, and I won't spend a lot of time on this, but it's our position that Target should have to show as part of its initial burden on summary judgment that they didn't cause the roof leak themselves. Otherwise, it creates an open question. It creates an immediate issue of fact that they did cause the leak. They can't answer it. They won't answer it. It's a credibility issue. And a jury, Judge, should make that credibility determination, not the court, as to whether or not Target caused that leak. So, to put it simply, Target shouldn't get summary judgment on an issue that they can't explain themselves. And it's a fascinating discussion. If you go through Addix v. Kress to Celatex to Anderson v. Liberty Lobby, the descriptions of how a defendant is supposed to properly support its motion for summary judgment is all over the map. And I guess that's because it's hard to cover every situation. So, but in this particular case, we have something very similar to Addix. We have a mystery. We have a mystery. How did the leak happen, and why can't the defendant explain it? Why won't they? Well, they don't have to explain it, but if they choose not to, they don't get summary judgment. They don't get to switch that initial burden for advancing a motion for summary judgment onto the plaintiff, What's the authority, counsel? I mean, if you're the plaintiff, and you're saying under a premises liability theory that they had constructive notice, why is it their burden to explain whether they caused it or not? I would have thought the plaintiff, you know, the way you could establish summary judgment is that the plaintiff, which has the burden of proof under whatever theory it seeks to advance, hasn't presented evidence that creates a genuine issue of material fact. And it wouldn't be the defendant's burden to prove its defense or prove that it didn't cause it or whatever. Again, I'm not going to spend a lot of time on this, but I do think it's important to say what is the defendant's burden? What is it supposed to be for them to advance a motion for summary judgment? If you're going to look at Addix v. Kress, which I think is cited hundreds of times in every motion for summary judgment, every order I've ever seen, Addix v. Kress, Anderson Liberty Lobby, Celotex. Remember, Addix said, hey, if there's going to be a conspiracy that the defendant says does not exist, but the defendants have information in their possession, in their control, and they don't give it up, they don't explain their position, what does the Supreme Court do under those circumstances? They say, you have not satisfied your burden to proceed with a motion for summary judgment. That's what Addix says. It's never been overruled, all right? And this case has a similar mystery. The information is on the hands of the defendant. The plaintiff is outside looking in. We think there should be – I'm not telling you how to spend your time, but I'd like to hear the evidence of how long the water has been there. I appreciate that. I'm going to focus right now on that. All right. As far as – there is an issue of constructive notice here, an issue of fact. And the puddle formed by drips, not by a sudden gush of water, to a size of 2 feet by 7 foot puddle. A jury is allowed to take the inference of how long does it take to form a puddle that size of 2 feet by 7 feet. If you take a poll in this courtroom right now, someone who says, how long do you think it takes to form a puddle? I don't know, but it takes a long time to form a puddle 2 feet by 7 feet. And that issue, Judge, is not an issue for the judge to decide. It's not for the trial court to decide. And this court in Cedar v. Town of Reston made that very clear. When there are issues of fact, it's up to the jury to decide. And I thought that case was very good in terms of reinforcing the reason why we need jury trials in this forum. And if there are issues of fact, the judge can't weigh the evidence. It's the jury's position. It's the jury's role. The jury can't speculate either. So the question is, you made a statement that the puddle took a long time to form. But what's the evidence that's in the record that supports that? That is what a jury does based on common sense. I can't remember the actual jury instruction, but the common sense. The jury is able to take the facts of record that there was a ceiling that was dripping water onto the floor. They can take the facts of record that it was caused by excessive rain. What's the evidence that there was a slow drip? I mean, that's the whole—what's the evidence of that? That is a question that the defense asked. Do you need to have a drip rate? That's the question. I've got some here. The woman that was the target's leader of the day, the day manager, recorded her observations that day. As rain had leaked through the roof and began dripping on the ground, called it the ground, leak discovered from slip, area now cleaned and has wet floor signs. Not easy to see the water. And then the first target employee to arrive at the scene said, quote, water leaking from ceiling formed a puddle. Now what does that mean? Yes, Your Honor. When you look at the light, the evidence in the light most favorable to the plaintiff, it is a leak that has formed from excessive rain that night, that morning. They answered interrogatories and said it was a roof leak. It did say that. Yes, roof leak. Target said roof leak. Right. So it's leaking from the roof. Your client, the plaintiff here, is what I think in the law of Virginia is referred to as an invitee. Correct. And that means what? What's the duty owed by commercial entities such as Target to an invitee in their premises, in their store? Right. What is the duty? The duty is to make the premises reasonably safe and to warn of conditions that they know or should know about. In this particular case, Your Honor. Is there any question that she's an invitee? No question. No question at all. She wasn't a customer. Wasn't she working for another company that was doing something in the store? She has to have permission to be on the premises. So she is an invitee on the premises. Is that the highest duty that's owed? It is the highest duty. Unless it's an innkeeper, then it's the highest. This is Virginia law. Yes, Your Honor. This goes to state law, not federal law. It's Virginia law. State law. State law. Virginia law. The duty to the invitee is the highest duty. Correct, Your Honor. And in this particular case, we look at the evidence in the light most favorable and the inferences most favorable to the plaintiff. No one has a stopwatch, Judge Diaz. No one has a stopwatch on this. But when you look at the inferences and the evidence of a record in the light most favorable to the plaintiff, the jury gets to decide this, whether in their common experience, a dripped puddle that causes two feet by two feet. It's not a small puddle. It's not this big. It's not this big. It's big. It's two feet by seven feet, and a jury gets to use their common sense as part of the jury instructions to determine whether that puddle gave sufficient time that target would have notice of it and remedy the condition. Was there any direct evidence that someone saw the drip? There is no direct evidence, and it gets back to Justice Sotomayor. But the problem then is the jury is asked to speculate, right, because it's just as equally plausible that a tile could have just given way and the water splashed down in one fell swoop. I would disagree respectfully. There is no evidence that a tile gave way in this case, none. So I think we should just remove that from the conversation. What the jury is going to have is the evidence of a tile dripping water onto the floor from rain that started overnight and took a very long time from common experience to form. There's no stopwatch on it, but the jury will have to make that decision as to how long was a sufficient time to detect it. Does it matter? I'm sorry to cut you off. It's an issue I wanted to think about. Does it matter? I think where this leak occurred was, you said, in the back of the store. It does. It seems like we're looking at what is a reasonable amount of time for a store to have noticed. Does the fact that it's in the back of the store as opposed to a checkout line or more frequently traveled lanes matter at all, or is that kind of just a question for the jury? Yes, and I think it is a question for the jury, because the evidence of the record is that there were four employees that were back in the back of the store working in that area. There is no evidence that they saw it and ignored it, correct? They did not see it. Again, it was clear on the floor. You don't think it's clear. Your client doesn't think it's clear, right? Absolutely. She didn't see the water, Judge. She's walking towards the back of the store. I think your point about contrib is well taken, but it also seems to create an issue about whether it was a noticeable leak too, doesn't it? For the defendant? Was it a noticeable leak to the defendant or the plaintiff? Do they have a better way of seeing water? Is there any difference in the eyesight of employees versus the invitee? I appreciate you asking that, because remember, we started talking about the history of the leaks in this place, and they are told to look out for water after heavy rain, and this is exactly what happened. The defendant… About the air conditioning unit. So… On the roof above this leak. I absolutely want to get to that. It worked on, and a door on the unit was left open. Yes, Your Honor. Thank you. So Target created… Well, there's an issue of fact in terms of whether Target created this leak, because David Hahn, the plaintiff's expert, opined that the water came in through an open door on the Seasons 4 unit on top of the store. And again, he opines, defendant says, and the judge below says, well, that's speculation that water came in there. But it's not speculation. His opinion is an excellent opinion. It's a very detailed report. If you read through it, it's based on facts of record that there was maintenance on May 9th. Is that your expert witness? Yes, Your Honor. Yes, Your Honor. He says rain came in through an open door that was left open on top of the roof. That's where the water comes from. That's where all the evidence says the water comes from. Why does that matter? Because he doesn't give, as I recall it, any opinion about whether if it came in that way, it came in quickly or slowly or how long it had been there. So why does it matter whether it came in through an open door or standing water on the roof? If it comes in through an open door, that's the other part of it. He uses deductive reasoning because the target says there's no repair on the roof. They have no records of repair. What's he left with? He's left with the idea that there has to be something directly above the leak. What's directly above the leak on the floor, on that puddle? That's where the HVAC unit is. It's like a school bus. It's enormous. So you leave open the door. The rainwater comes in. You get the facts and inferences of record to conclude that that's where the leak came from. So what? That creates the leak. Therefore, target has constructive notice. You don't have to get into trying to find out exactly how long the water was on the floor. I don't get that. If it came in because they left the door open, how does that give them more or less constructive notice than if it was just standing water on the leak from heavy rain? Because they created it. It's under the Austin v. Shoney's case that the Supreme Court in Virginia decided. It's exactly the same. That's a claim, isn't it, that the Shoney's case I thought was – maybe I'm wrong. You know Virginia law better than me. It was a case where you were advancing a more traditional negligence theory. Was it a premises liability case? Yes, premises liability. It was an expert who was testifying that the slippery floor was created by probably a poor combination of cleaning products. So the Shoney's case stands for the proposition that if the defendant negligence causes the hazard, that you don't have to show constructive notice? They have constructive notice already. Because once you create that hazard, then you own it. That's it. And there's great language in the Shoney's case. It's a logical inference that is created by the facts and so forth. And this expert opinion should be allowed so that we get that logical inference based on the facts, not speculation, Your Honor. Before you sit down, I wanted to ask you about a recent unpublished decision of our court, the Omni Hotels decision, which – are you familiar with that? I don't think I am, Judge. Well, in that case, it involved a slip and fall in the context of a hotel and the formation of ice on the ground next to a water fountain. And our court – and this was arising under Virginia law. It was Omni, I think, at the Homestead or somewhere in Virginia. And the plaintiff in that case made the same argument that you're making here, that a jury should be allowed to use its common sense to determine how long it would have taken the ice to have accumulated at the base of the fountain. And the court in that case said that's incorrect because Virginia courts apply ordinary constructive notice principles to the presence of a dangerous condition, in this case ice, to require evidence of how long that specific hazard was present. So it seems to suggest that under Virginia law, we can't allow a jury to speculate with respect to your situation simply based on the fact that this puddle had been fairly long, fairly deep, and the like. So tell me why that's wrong. I do respectfully disagree, Judge Diaz, because in this particular case, you have the common experience of people knowing in the community and the juries, what does it take for a drip from a ceiling, all right? What does it take for a drip from a ceiling to form a puddle this big? You cannot do the same calculation of common experience with ice, all right? I don't think you can do the same thing with ice. This is not a sudden gush of water. This is a drip, drip, drip. Well, I'll take your premise that it's not a sudden gush, but the plaintiff made that argument. He said there, because ice takes time to form, a reasonable jury could conclude that the ice that the plaintiff slipped on in that case had existed for a sufficient period of time that it would have been discovered by the Omni employees. That seems to me to be this case, and we said there, under Virginia law, that's not good enough. I would only offer this one thought, Judge, because I know I'm over time. There is a case out of – I think it's been cited quite a bit. It's called Wal-Mart Stores v. Tinsley, and that was a large puddle formed by water dripping from the ceiling as opposed to suddenly by a spill. And the court there said it is some evidence. It is some evidence that it was more likely than not the water had slowly dripped long enough for the defendant reasonably to have discovered it. And we look at the evidence and it's like – Is that a Virginia state court? It is not, but I didn't see one out of Virginia. It is almost directly on point. I offer it for the judge's consideration because I think it is important. That combined with the report of David Hahn gives enough evidence to survive a motion for summary judgment. And it's not for the judge to decide that this case can't go to trial or with a jury. There's enough evidence here on a number of grounds. I haven't even covered them all. But that the jury should be able to decide whether issues affect exactly like the Cedar case does and that you have a variety of ways to choose this, Judge. You have a variety of ways to choose this for constructive notice. They either create it or the jury gets to decide from their common experience that dripping water on two feet by seven feet under the circumstances of this case will allow the court to let this case go to trial. And we'd ask respectfully that the court reverse the order of summary judgment granted to Target. Thank you. Thank you, Mr. Leach. Mr. McGavin. Thank you, Your Honor. You're here for Target Stores. Yes, Your Honor. Good to have you, sir. Thank you very much, Your Honor. I'm John McGavin. May it please the court, I'm here on behalf of Target Stores, Inc. We ask that the court affirm the decision of Judge Hilton. This is a garden variety slip-and-fall case where the issues are actual notice and constructive notice, and the focus of the inquiry is constructive notice. I would ask the court to consider in this case the facts of this case are unique in that we have water overnight for a considerable amount of time, a considerable volume of water. The store opens at 8 o'clock. We have Ms. Joseph, who is working as a vendor in the store with some of her colleagues. We have our employees. We have customers open in the store. This is near the freezer aisle, aisle 27. And there is no discovery of water until Ms. Joseph has her unfortunate fall. You agree she's an invitee under Virginia law? I'm not sure, Your Honor. She's there for her own purpose, and when the court asked that question, I had not considered that before. But I think she... Well, for purposes of summary judgment, wouldn't she get the benefit of it then, whether she is or not? The court never addressed it, and we never discussed it. That court didn't, but I'm talking about this court. Of course, Your Honor, I know that. Reviewing a summary judgment, she would have to be given the benefit of that. I think she would be a bare licensee because... Okay, you think she's not an invitee, she's a licensee. I think she would be. Maybe that's a jury question. Maybe you'd have to have a jury and instruct them on the distinctions, and they'd have to first decide whether she was a licensee or an invitee to decide what kind of duty was owed to her. Typically, that's an issue in slip-and-fall cases in Virginia for the judge to decide, but I could see how that could occur, Your Honor. The court could instruct on both. You know a lot about the Virginia law than I do. I'll give you that. I've tried a lot of these slip-and-fall cases, Your Honor. I have. Well, both of you know a lot more about Virginia law. Well, I don't know. I'm sure you know quite a bit, Your Honor. I'm sure you're well-versed, and I would not be so presumptuous. You've tried a lot of these cases. You just don't want to try this one. No, Your Honor. Ms. Joseph had some serious injuries. They're fun trials, aren't they? Pardon me? Those are fun trials, these slip-and-fall cases. Judge, I've tried almost 400 jury trials. I've tried slip-and-falls and car wrecks and defamation. You name it, I've tried it. That's the reason the law books are full of them. I have quite a few reported cases, Your Honor, in the Virginia Supreme Court. So I'm not afraid of it, and I'm happy to try it. But, Your Honor, the state court in Virginia is very different than the Fourth Circuit and the district courts. And our state courts, at motions to strike, when you look at Virginia state court cases, first of all, our motions for summary judgment are virtually abolished. We can't use depositions to support summary judgment. And the Virginia Supreme Court, ever since the case of Brown v. Koulizakas, has been saying, we address the unfortunate circumstance where the Virginia Supreme Court has taken this case away from the jury. Here, as this court said in Cedar, the use of summary judgment is a valuable tool, so that cases are not going to trial that shouldn't. And on this record, Your Honor, we believe Judge Hilton got it right. Counsel, what's your position on your colleague's argument that if the expert's opinion is considered, that the leak was caused by target's negligence? I know there's a disagreement about whether that conclusion is sufficiently supported by evidence. But assume, for the sake of discussion, that's a valid opinion. Do you agree that if the leak was caused by target, that that creates constructive notice in and of itself? No, Your Honor, I don't. And I think it would be more properly categorized under the Virginia cases as actual notice rather than constructive. So in other words, if you constructed a sidewalk, going back to Cedar, Your Honor, you wrote the opinion. But in Cedar, that was a case where the bricks were loose and the caulk was loose, and it was obvious that it deteriorated over time. But in a sidewalk case, if they constructed it, and even in Cedar, the way they constructed that lip, it created a risk of harm because the man who came on the scene said, I almost tripped over it a thousand times. But if it's broken, they're supposed to come in and fix it. As soon as they know about it. So why wouldn't that negligence have an impact? That's the constructive notice, Your Honor. That's the constructive versus actual. I'm talking about, I'm back to the invitee. You owe the invitee if she's an invitee. You owe her a reasonably safe place to be if she's in your store as an invitee. I may not be reciting the proper standard. I ask him for it because I didn't want to have to try to recite it myself what the law is on invitees in Virginia. But I practice law in West Virginia, and I know that was the highest duty owed on your property was to an invitee. And that's what stores owed to people who come in there and shop. They had to have a safe place to walk around. It's a little different than that, Your Honor. Virginia law says very specifically that the shop owner is not an insurer of the safety of the guest and that we must exercise reasonable care. That's what I said. I'm not saying you're an insurer. You have to have a reasonably safe place for people that are going to come in there that you're attracting. You want to bring customers in, and you want to take care of them. You want them to buy from you. You owe them a duty. I agree. A safe place to shop. That's what Target wants. They understand Target is one of the biggest in the world. They're big. And they've got nice stores. They attract a lot of customers. They want them to come back next week and all that. Absolutely, Your Honor. And we probably had a lot of customers on this particular day. But I would say it's slightly different. We don't guarantee the safety. We have a duty to exercise ordinary care to see things we should have seen, which goes back to the questions that this panel has asked on the notice issue, on the constructive notice. And counsel seems to be taking the statement by the employee, Ms. Santani, who said, when I discovered it at 120 or 130, it was dripping. That doesn't mean it had been dripping from the inception. And the problem with the plaintiff's record is we can't tell whether it was collecting on the ceiling tile. We don't know when it started, but we know that there was a puddle that was 2 feet by 7 feet. That's all we know, Your Honor. So your drip created a puddle that was 2 feet by 7 feet. And he says, well, then common sense ain't trying to figure out how long it took drips to create a puddle that was that big. Where she fell and whether the store should have known it. And the question is, and this goes back to you or anybody, except maybe the students, the question here is whether that's a question that could be decided by the judge, which was decided here by the lower court judge, or whether it's a question that should go to the jury, whether there's a trial that ought to be had in front of a jury to decide all this. And that's what we're here all about on the appeal. Of course. But the problem is, was it a drip? Was it a stream? Was it a sudden failure? And there's no evidence on that. Well, there is evidence because he said drip. But I think even, I mean, the employee said drip, I think. At the time of discovery. At the time of discovery. But isn't there a question, even if it's a drip, I mean, there are all sorts of different drips. And, you know, you could have a drip that happens pretty quickly. I don't think, you know, you could have one that's so slow that it takes a long time to do that. And I think the real question is under Virginia law, at least to me, is do you all, because there's various speeds at which water can form depending on what happened, do you send that to the jury? Or does a plaintiff who has the burden of proof in a case have to do something more than speculate? It could have been this way versus that way. And, I mean, isn't that our question is whether, you know, whether they have to have some evidence that it happened slow enough that it should have been noticed. Judge, this is, believe it or not, Virginia jurisprudence, state court cases are filled with this issue. You say they're filled with the issue? Yes. There's many cases on this. A lot of them, in other words. Yes, sir. Simple language. Yes. There's a bunch. Grimm versus Rahe. It's an electric shock case up in, I think it's in Shenandoah County or Woodstock, which is not too far from West Virginia. And in that case, at the store, they had taken out the socket, the bulb, one of those fluorescent bulbs, and left the two prongs. And a young boy apparently put his hand up on it and got a burn and a shock. And the Supreme Court says, we don't know how long that bulb had been gone or that socket had been damaged. And there was no constructive notice. Colonial stores versus Pulley. That's a Pepsi bottle on the floor. We don't know how long the Pepsi bottle was there. And we didn't, meaning the store didn't have to put it there. It didn't matter. It could be a customer. It could be anybody else left a Pepsi bottle. But since they couldn't figure out how long it was there, it couldn't overcome. It couldn't proceed. Counsel, I don't mean to keep you from going through those cases, but Judge Diaz asked about the Omni Hotel case from our court that, you know, has language that suggests physical appearance isn't sufficient evidence. Does Virginia law comment on that issue? I mean, if you had a gas or an oil spill in a gas station parking lot that it kind of crusted up around the edges, for example, would evidence like that give some indication of how long a hazard had been there? There are cases on that, Your Honor. I'll cite you to Memco case where the employees moved a plant up to the front. One of the leaves fell off and it turned dark brown or very brown. And the Supreme Court says, well, that's evidence that it had been there for a while. Likewise, in the Winn-Dixie case in Parker, it was a green bean on the floor in the grocery store. And they took some evidence as tried to take some evidence as to how it appeared. Here, with water, it's water. Your point is that Virginia law apparently allows some consideration of physical characteristics. But your point here is that we don't have anything that suggests one way or the other from the water here. Yes, sir. That's exactly the point. The case says you can draw by inference and create a jury issue based upon appearance, but there's nothing about water that tells you by appearance how long it had been there. And that's the real weakness in this case. You're saying it's a weakness. You try cases if they're weak. You've got to say fatality, right? Those are the fun cases. Yes, sir. I guess that's why we're all here. But, yeah, and I think that's why Judge Hilton reached the decision that he did. It would be relevant here, wouldn't it, in deciding this, when it rained, how long it rained, when it stopped raining, in relation to when this happened. I didn't hear the first part of your question. I'm sorry. When it rained. I mean, it rained for several hours, apparently, on this record. And I think there was something in one of the briefs that rained nearly an inch of rain or something. And how long did it rain? When did it stop in relation to when she fell? And we do know that immediately upon her fall, your people saw the leak. It said the roof leaked. And it had been leaking. There's three of them, I think. There are two or three people that said that, including the store manager. Well, all that would have to be taken into account, wouldn't it? Wouldn't that be the kind of stuff that would be just exactly what a jury ought to have to figure out? The question for the jury judge would be, you should find your verdict for the defendant if you can't figure out when this started and how long it was leaking. You're talking about the leak rather than the rain. Yes, the leak. We know the rain started. I understand. It stopped roughly shortly before. They need to try to figure out when the water started pooling on the floor. Exactly. And they'd have to guess. And Virginia law on that is very clear. If you have to speculate. The question is whether you classify it as a guess or not. I think I characterize it as a guess, Your Honor, respectfully. Because you're representing Target. But the other side wouldn't characterize it as a guess because they're representing the plaintiff. And that's the reason that sometimes you have jury questions. They decide what the facts are. To follow up on Judge King's point, I think it's a good one. But it's really not what you say. It's not really what your colleague says. It's whether there's evidence. There has to be evidence of some sort that indicates it's been there for a long enough time that it should have been noticed. Precisely, Your Honor. And I would ask my colleague, all right, if that's your theory, when did it start leaking? Because he doesn't have that answer. And his rebuttal to that is to cite addicts and say, Target, you have to figure it out. And I disagree with that. Isn't, I mean, in discovery, wouldn't you do that? You'd go in. I mean, you have the right. I don't certainly fall counsel because they probably came in after this. But discovery allows you to go in and get whatever information you could get. I mean, for example, is there any information about what the ceiling looked like or didn't look like? And I don't know if that's not in our record. It's not being talked about. But, you know, it would allow that type of situation, that type of inquiry. Apparently, the record doesn't have stuff like that. Not to my knowledge, Your Honor, and I could be corrected on that, but not to my knowledge. And this is just one of those cases where there isn't evidence. And it really falls under that line of cases of Grimm versus Rahi, Colonial Storm Pulley, Winn-Dixie and Parker, where there's just not enough indication of when it started, how fast it accumulated, and whether or not we should have been on notice of it. We know it started sometime before she fell. Of course. And it probably started sometime after the rain started. So you've got a window there. Very big window, Judge. And you have to look at it here in what we're looking at, what the district judges most look at, in the context of deciding a, quote, summary judgment motion, which is what the appeal's about. We have to take the facts in the light most favorable to the plaintiff, Ms. Joseph. The judge had to look at it. We have to look at the facts in the light most favorable to her. And the jury is entitled to look at the permissible inferences from the evidence in the light most favorable to her. Do you agree with that? Of course, Your Honor. You're stating black-letter law, but there has to be facts. I think that's probably what they call black-letter law. That's the sergeants in bold type. I hope the students are picking up on that pointer, Your Honor. But it is. That's black-letter law. But there has to be evidence beyond a speculation to say starting point and stopping point, particularly because under this fact pattern, we have multiple hours of rain overnight. We have a store opening at 8 o'clock at or about when the rain stops. And then it's another five and a half hours until she has her incident. Do we know the rain stopped at 8 o'clock? The record, I believe, Your Honor, from the meteorologist was that it stopped at 7 or 8 sometime in that rain. It's probably reasonable to assume that by that time, maybe these stores got pretty flat roofs. There might be some water pooled up there on those roofs, and it might hang around there while it leaks down. Or, Your Honor. Isn't that right? That's right, but it's a membrane on a metal roof, and water travels. Water goes downhill. Well, it's looking for someplace to get in. It always goes downhill, I assure you. That's right. Always. I agree, Your Honor. So the point is whether it was a slow leak or it collected, as you say, and then released. And we know that they left open the door on the air conditioner that they had fixed. And that was sitting right above there. That's in the record here, too.  Your Honor, my time is almost up. May I answer? Well, I know you can answer. As long as you get questions from me or either Judge Diaz or Judge Padelbaum, you answer every one of them. Thank you, Your Honor. I just want to be respectful to the press. That's more if the student is for you to make that comment. But go ahead. Thank you, Your Honor. I'm sorry I got distracted by the time. I apologize. You were asking me about the open door. We really haven't talked about that, and I was going to raise it as well. Because if, in fact, there's evidence in this record that suggests that the HVAC door was left open, or at least a conflict in the evidence, and, geez, we may be having another case here pretty soon. So, I mean, if there's a conflict in that evidence and the jury could find that the leak was caused as a result of the open door on the HVAC unit, that would change the complexion of the case, wouldn't it? I don't think so, Your Honor. And I think Judge Quattlebaum phrased that at the very beginning. It really doesn't matter because it still goes to constructive notice. And in this case, of course, that open door argument is completely speculative because this case changed. It went from a failure to maintain the roof, and then all of a sudden, near the end of discovery, it became this open door after the man went up on the roof. So we were defending a moving target, I would point out. But just to be clear, he had two opinions. Not only the open door, but a clogged drain might have been there. And our employee, Matt Campbell, went out on May 23, 2016, at 5.41 a.m., less than 48 hours later. And his affidavit confirms that the door was not open. And it's not just you kind of throw it closed. You have to close it and latch it. And he also, when he went up there, did not find any evidence of a clogged drain. So their expert has not just one, but two theories, and neither of which are supported by the record. So I think it still goes back to this issue of constructive notice. Even if there was a source that caused the leak, the question is whether or not we knew or should have known that it was coming down. Just because a door was open doesn't mean that we're going to be responsible for a leak into the Aisle 27. Unless the Court has any other questions, I thank you very much for this interchange and the opportunity to appear before this panel. Thank you. Thank you, Mr. McGavin. Thank you, Your Honor. It's good to have you with us. We appreciate it. Thank you, sir. Mr. Leach. Thank you, Your Honor. There is a conflict in the evidence to address Judge Diaz's question on whether the door was open or not. Mr. McGavin cited the declaration of Matt Campbell. That's on the record of page 347. And he doesn't say the door was closed. He says, I do not believe I left any compartment doors open upon completion of the HVAC maintenance on May 9, 2016. He doesn't. But isn't the only evidence that your expert based that on two things? One, that the door had been opened like a month before in some other incident. May 9th. Yeah. And the fact that there was a leak. I mean, the fact that they left the door open once, apparently, and the fact that there was a leak is the only thing that led… Not only that. Not only that. What other evidence was there that he relied on to say that the door was left open? That there was an excessive rainstorm that day or that night, and there was a leak right below the HVAC unit, which, relying on the laws of physics, which do not cease to operate on the, you know… The location. Right. So he's putting these pieces together scientifically, deductive reasoning, making logical inferences based on everything that you see there, Judge. And what does Target say? They say there is no patch. There is no roof leak. So what else is there? He says it's more likely than not that the door was opened. I don't think this just happened on its own. Target doesn't say it happened on its own. They have to have an explanation. It's not a Pepsi bottle that happens suddenly to be dropped by a customer. It's not some kind of sudden event. It is a drip, drip, drip event after a heavy rainstorm where it obviously falls down from the HVAC unit directly below onto the floor. And this is a classic jury question. It should be tried. It should not be dismissed by the court. And this court made a very nice point in the Cedar case where there are issues of material fact that remain. The court should not dismiss the case. It's for a jury trial. And that's what we're doing here. We're just trying to make sure that this person gets their day in court because Target is not telling us anything. And we've got to figure it out on our own. And I think we did that. And we've done it to the point where this particular unit was left open by Target. And whether it's constructive or actual notice, Target owns the hazard that they created. And there's also evidence that they can use their common sense that the drips cause this puddle with sufficient time to be noticed by Target. Thank you very much. I'm sorry to take up so much of your time. But we feel strongly about it and appreciate your attention. Thank you, Mr. Leach. We appreciate counsel's assistance in this case. It will be taken under advisement. And we will now come down and recounsel and take a brief break. The Honorable Court will take a brief recess.
judges: Robert B. King, Albert Diaz, A. Marvin Quattlebaum Jr.